IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. |
|---|---|
| Plaintiff, | **COUNT ONE** <br> *(Conspiracy to Pay and Receive Kickbacks)* <br> 18 U.S.C. § 371 <br> NMT Five Years Imprisonment <br> NMT $250,000 Fine <br> NMT Three Years Supervised Release <br> Restitution may be ordered <br> Class D Felony |
| v. | |
| TIMOTHY A. CHIN (01) <br> [DOB 7/24/1958] | |
| and | |
| LAUREN M. SWORD (02) <br> [DOB 1/09/1986], <br><br> Defendants. | **COUNTS TWO THROUGH TWENTY-THREE** <br> *(Wire Fraud)* <br> 18 U.S.C. §§ 1343 and 2 <br> NMT Twenty Years Imprisonment <br> NMT $250,000 Fine <br> NMT Three Years Supervised Release <br> Restitution may be ordered <br> Class C Felony <br><br> $100 Mandatory Special Assessment on Each Count |

# I N D I C T M E N T

### Introduction and Background

#### The Medicare Program

1. The Medicare Program (Medicare) was a federally-funded program that provided free or below-cost health care benefits to qualified people, primarily the elderly, blind, and disabled. Medicare benefits were governed by federal law. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services, oversaw and administered Medicare. Individuals who received Medicare benefits were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by 18 U.S.C. § 24(b) and a "Federal health care program" as set forth in 42 U.S.C. § 1320a-7b(b).

3. A Medicare claim had to include important information such as: (a) the Medicare beneficiary's name and unique identifier number; (b) a description of the health care benefit, item, or service that was provided to the beneficiary; (c) the billing codes for the benefit, item, or services; (d) the date on which the benefit, item, or service was provided; and (e) the name of the referring physician or other health care provider, as well as the provider's unique identifier number.

4. To receive payment from Medicare, health care providers had to enter into an agreement that included important certifications. For example, the provider agreed to abide by Medicare laws and regulations, including the anti-kickback statute, and the provider would "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and [the provider] will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

<u>Genetic Testing</u>

5. Cancer genomic (CGx) testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancer. Pharmacogenetic (PGx) testing used DNA sequencing to assess how the body's genetic makeup would affect its response to certain medications. Both of these tests were generally referred to as "genetic testing." Genetic testing was not a method to diagnose whether an individual had a disease, such as cancer, at the time of the test.

6. To conduct genetic testing, a laboratory needed to obtain a DNA specimen from the patient. Specimens were typically obtained from the patient's saliva by using a cheek swab to collect cells to provide a genetic profile. The specimen was then submitted to the laboratory.

7. For Medicare beneficiaries, their DNA specimens were sent along with laboratory requisition forms that identified the beneficiary, the beneficiary's Medicare information, and the specific tests to be performed. In order for the laboratories to submit claims to Medicare for genetic testing, the tests had to be approved by a physician or other authorized medical professional who attested that the test was medically necessary.

8. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the function of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis or a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). The statutory exceptions that Medicare covered included cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

9. If diagnostic testing were reasonable and necessary, Medicare had additional requirements. For example, "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32. "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

### Timothy Chin, Lauren Sword, and Senior Community Care LLC

10. Defendant Timothy Chin organized Senior Community Care LLC under Kansas law on February 28, 2019. On September 1, 2019, Chin filed a form with the Kansas Secretary of State to change the name of Senior Community Care to Momentum Med Services, LLC.

11. Senior Community Care and Momentum Med Services, LLC were the same entity and will be primarily referred to herein as Senior Care to avoid confusion with Momentum Sales & Marketing, LLC, which was the company owned by Clifford Powell and Christian Arendt referenced in paragraph 17 below.

12. Chin and Sword jointly owned and operated Senior Care.

13. Sword was a chiropractor and the owner of Adjust to Health Chiropractic in Lenexa, Kansas.

14. Sword enrolled as a Medicare provider on or about March 18, 2015, and she remained a Medicare provider at the time of the events in issue. In Sword's application to be a Medicare provider, she certified, under penalty of perjury, that she understood that Medicare's payment of a claim was conditioned upon the claim and underlying transaction complying with Medicare law including, but not limited to, the federal anti-kickback statute. She also certified that she would not knowingly present or cause to be submitted a false or fraudulent claim for payment by Medicare and would not submit claims with deliberate ignorance or deliberate disregard of their truth or falsity.

### Matthew Harrington, Miranda Harrington, and MBM Solutions LLC

15. Matthew Harrington, Miranda (a/k/a Mandy) Harrington, and William Rowland were owners and operators of MBM Solutions LLC (MBM), a Florida business entity. MBM was involved in marketing genetic tests to Medicare beneficiaries, and it purportedly received

4

kickbacks and bribes from Momentum Sales & Marketing LLC (Clifford Powell and Christian Arendt's company referenced in paragraph 17 below).

16. On December 30, 2020, the United States District Court for the Eastern District of Texas accepted the guilty pleas of Matthew Harrington, Miranda Harrington, and William Rowland.[1] These defendants pled guilty to violating 18 U.S.C. § 371 (conspiracy to pay and receive health care kickbacks). *See United States v. Matthew Harrington, et al.*, No. 4:20CR-108, Doc. # 79 & 80, United States District Court for the Eastern District of Texas.

<u>Clifford Powell, Christian Arendt, and Momentum Sales & Marketing LLC</u>

17. Momentum Sales & Marketing LLC was a business entity operating out of New Jersey and Florida that marketed genetic tests to Medicare beneficiaries. Clifford Powell and Christian Arendt were owners of and operated Momentum Sales & Marketing.

18. On November 19, 2021, the United States District Court for the Northern District of Texas accepted the guilty pleas of Clifford Powell and Christian Arendt. They pled guilty to violating 18 U.S.C. § 371, that is, conspiracy to defraud the United States and pay and receive kickbacks; and 42 U.S.C. § 1320a-7b(b)(1) and (2), that is, the Federal Anti-Kickback Statute. *See United States v. Clifford H. Powell III, et al.,* No. 3:21-cr-00438-N, Doc. #32 & 34, United States District Court for the Northern District of Texas.

<u>Federal Anti-Kickback Statute (AKS)</u>

19. The AKS makes it a crime for any person to knowingly and willfully solicit or receive any remuneration in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1). The AKS also makes

---

[1] Mr. Rowland died on January 10, 2021, and the United States Court for the Eastern District of Texas vacated his plea of guilty on January 29, 2021.

it a crime for any person to knowingly and willfully offer or pay any remuneration in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2). Both parties to such an arrangement may be criminally liable if one purpose of the arrangement was to obtain remuneration for the referral of services or to induce referrals.

20. Remuneration is broadly defined as anything of value, including money, goods, services, or the release or forgiveness of a financial obligation that the other party would normally have to pay. In passing the AKS, Congress intended to prohibit financial incentives that could affect the medical judgment of those providing or referring patients for health care goods or services.

## COUNT ONE
### Conspiracy to Pay and Receive Kickbacks
### 18 U.S.C. § 371 (42 U.S.C. §§ 1320a-7b(b)(1) and (2))

21. All previous paragraphs of this information are realleged and incorporated by reference as though fully set forth herein.

22. From on or about February 2019 through on or about September 2019, the exact dates being unknown, in the Western District of Missouri and elsewhere, defendants Timothy Chin and Lauren Sword did knowingly and willfully combine, conspire, confederate, and agree with each other, and others known and unknown, to commit certain offenses against the United States, that is:

   a. To violate 42 U.S.C. § 1320a-7b(b)(1) by knowingly and willfully soliciting and receiving renumeration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash or in kind, in return for referring individuals for the furnishing and

6

arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare;

        b.       To violate 42 U.S.C. § 1320a-7(b)(2) by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare.

<u>Object/Purpose of the Conspiracy</u>

23.    It was an object and purpose of the conspiracy for defendants Timothy Chin and Lauren Sword to unlawfully enrich themselves and others known and unknown by offering, paying, soliciting, and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiary information that was used to submit claims to Medicare.

<u>Manner and Means of the Conspiracy</u>

24.    The manner and means by which defendants Timothy Chin and Lauren Sword and their co-conspirators sought to accomplish the purpose and objects of the conspiracy included, among other things:

25.    Operating through their company Senior Care, Chin and Sword were marketers and patient recruiters for MBM, and they marketed genetic tests to Medicare beneficiaries.

7

Senior Care was one of other marketing sub-groups that operated in a payment structure that included MBM and Momentum Sales & Marketing.

26. Through their company Senior Care, Chin and Sword hired or contracted with marketers, sales representatives, and patient recruiters to target Medicare beneficiaries at senior residential communities and other locations, and to induce those Medicare beneficiaries to agree to genetic testing regardless of medical necessity. The Senior Care marketers, sales representatives, and patient recruiters will be referred to herein as "Senior Care Marketers."

27. Senior Care Marketers collected Medicare personal identifying information from Medicare beneficiaries, along with the swabs. Health care providers, such as doctors, then signed orders for genetic tests that were, in turn, used to bill Medicare for those tests.

28. Defendants Chin and Sword, through their company Senior Care, received kickbacks and bribes from MBM in exchange for the referral of Medicare beneficiaries for genetic tests and doctors' orders for those tests. Chin and Sword received kickbacks and bribes from MBM through electronic deposits into their US Bank account ending in 8747.

29. In turn, Chin and Sword, through their company Senior Care, paid kickbacks and bribes to their Senior Care Marketers in exchange for the referral of Medicare beneficiaries for genetic tests. They made these payments from their US Bank account ending in 8747, and the US Bank account ending in 1147 in the name of Timothy A. Chin DBA Senior Community Care, LLC. They also paid their Senior Care Marketers by authorizing Paycor to debit their US Bank ending in 1147 to pay them. The total that Chin and Sword, through their company Senior Care, paid in kickbacks and bribes to their Senior Care Marketers was $34,458.00 from June 2019 through September 2019.

30. Defendants Chin and Sword, through Senior Care, recruited Medicare beneficiaries for genetic tests who resided in the Western District of Missouri, among other places.

31. From in or around February 2019 through September 2019, Chin and Sword, through their company Senior Care and others, caused two laboratories to bill and be paid by Medicare. Those laboratories billed Medicare approximately $2,927,706.00, and Medicare paid them approximately $861,399.00, for specimens from 163 Medicare beneficiaries. Because defendants were involved in this multi-level scheme to defraud Medicare, they were paid kickbacks and bribes by MBM, and they paid kickbacks and bribes to the marketers below them.

32. From in or around February 2019 through September 2019, clinical laboratories associated with Momentum Sales & Marketing (Clifford Powell and Christian Arendt's company) submitted and caused the submission of claims to Federal health care benefit programs for genetic tests that were the product of illegal kickbacks paid to Chin and Sword and others.

Overt Acts

33. In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Western District of Missouri and elsewhere, the following overt acts:

34. On or about February 8, 2019, Mandy Harrington (one of MBM's owners) emailed Chin to provide him the "pay structure break down." She wrote: "With you being an IBO we will be paying your company and you will pay your Agents." IBO is an abbreviation for "Independent Business Organization." Harrington's email set forth the "IBO Pay" amounts and stated "This is for you, not your reps." The IBO pay schedule was the same payment per

specimen that was in the contract that Chin and Sword entered into with MBM two days later on February 10, 2019, as alleged in paragraph 35 below.

35. On February 10, 2019, Chin emailed Mandy Harrington and stated: "Here is my signed contract. Please have Matthew email me all remaining documents, marketing materials etc. Thank you. What is the next step?" Chin attached the contract, dated February 10, 2019, that Chin and Sword had signed. In that contract, MBM appointed Chin and Sword to serve as its sales and marketing representatives for its genetic testing services. The agreement set forth its compensation schedule:

> 8. **Compensation.**
> 8.1 With respect to pharmacogenomics (aka PGx) and BRCA and other genetic/genomic (aka CGx) testing, the ISO will receive the flat fee amount of:
> - $360 for each **Personal History Comprehensive CGx** qualified specimen
> - $240 for each **Personal History Partial CGx (Breast & Ovarian Cancer, Colorectal Cancer, Lynch Syndrome)** qualified specimen.
> - $120 for each **Personal History Brca1/Brca2** qualified specimen.
> - $75 for each **Personal History PGx Personalized** qualified specimen.
> - $270 for each **Family History Comprehensive CGx** qualified specimen.
> - $180 for each **Family History Partial CGx (Breast & Ovarian Cancer, Colorectal Cancer, Lynch Syndrome)** qualified specimen.

This compensation schedule specified how much defendants would receive in illegal kickbacks in exchange for the referring Medicare beneficiaries for genetic tests.

36. On or about March 12, 2019, Sword and other marketers visited The Springs at Independence, an independent living community for seniors in Independence, Missouri. Sword gave a presentation on genetic testing to residents there and told them it would be at "no cost" because Medicare would pay for it. After the presentation, residents were given a questionnaire to determine if they qualified for the screening. The questionnaire asked about the resident's family cancer history and for the resident's Medicare number.

37. Resident N.R., age 78 at the time, completed the questionnaire but was told that he did not qualify for the screening because he did not have cancer in his family history. N.R.'s

wife M.M. also completed the questionnaire, was told that she qualified for the screening, and had her cheek swabbed for the genetic testing on or about March 15, 2019.

38. Later, N.R. and M.M. reviewed their insurance claim summaries. N.R. noticed that a laboratory billed N.R.'s insurer $5,539.87 for genetic testing even though he never provided a sample for testing. N.R. called Sword to discuss the matter but his calls were not returned. M.M. received a bill for $1,848.64 from a laboratory for genetic testing, and M.M. later received a second bill showing a total balance due of $2,324.39 after Medicare paid a portion. M.M.'s insurance claim summary identified the health care provider who authorized the genetic testing as a nurse practitioner whom M.M. did not know. M.M. never received the testing results from her sample.

39. Medicare beneficiary A.V., age 86 years old at the time, also lived at The Springs at Independence and attended the same March 2019 presentation as N.R. and M.M. did. A.V. declined to submit a sample at that time. Later, A.V.'s daughter suggested that A.V. take advantage of this screening opportunity since it was at no cost. About a month later, a marketer visited A.V. and obtained her Medicare information. At that time, A.V. swabbed her own cheek and gave the sample to the marketer.

40. Chin and Sword and others caused Medicare to be billed $21,781.42 for genetic testing for Medicare beneficiary J.T. J.T. allegedly qualified for this testing based on a family history of ovarian cancer. J.T., however, was a male.

41. On or about March 1, 2019, L.B. entered into a contract with Senior Care which appointed L.B. to be its sales and marketing representative for genetic testing. The contract had a compensation schedule for CGx and PGx specimens. For example, L.B. would receive a flat

11

fee of $225.00 for each comprehensive CGx qualified specimen. Between on or about April 16, 2019 and on or about September 4, 2019, Senior Care paid L.B. $610.00.

42. On or about April 16, 2019, Chin wrote a check, from his US Bank account ending in 8747, to L.B. for $65.00. A notation written on the check indicated that it was for "DNA Test event." On or about May 5, 2019, Chin wrote another check from that account to L.B. for $65.00, and the check indicated that it was for a "commission."

43. On or about May 3, 2019, Chin wrote a check, from his US Bank account ending in 8747, payable to A.R. for $345.00. A notation written on the check indicated that it was for "commissions." A.R. was a chiropractor who had worked at the chiropractic clinic owned by Sword.

44. On or about May 5, 2019, Chin wrote a check from his US Bank account ending in 8747, payable to L.G. for $330.00. A notation on the check indicated it was for "commission."

45. On or about May 14, 2019, Sword emailed their Senior Care Marketers and terminated their contract. However, Sword offered them the opportunity to enter into a new contract with Senior Care to market its genetic testing services. The contract purported to compensate the representatives on the basis of "customer surveys" and accomplishments such as mailing in swabs within 48 hours of completion.

46. An example of this new compensation structured purportedly based on "customer surveys" is seen in Senior Care's contract with A.R. dated on or about May 16, 2019. In that contract, the compensation structure was as follows:

> **8. Compensation.**
> With respect to customer surveys for every five submitted 4 or 5 star surveys (per pay period) the ISO will receive a flat amount of $250
> For the same five surveys an additional bonus up to $825 may be earned by satisfying the following requirements:
> - An underwriting competency score of 95%
> - All agent revisions completed and resubmitted in 72 hours
> - All swabs mailed with 48 hours of completion
> - Fully completed prequalification form including the referral questions submitted by email with each submission.
> - Must attend 75% of all Monday night leadership calls and watch recorded leadership calls for any missed information.

47. On or about May 15, 2019, S.G. entered into a contract with Senior Care which appointed S.G. to be its sales and marketing representative for Senior Care's PGx and other cancer genetic/genomic testing.

48. On or about May 18, 2019, S.G. emailed Sword: "Hi just wondering when do I get paid for my swabs I sent in." On or about the same day, Sword replied via email: "Hi, Hopefully this next payment on the 5th." On or about June 3, 2019, an electronic payment through Zelle in the amount of $165.00 was made to S.G. from Senior Care's US Bank account ending in 1147.

49. Clifford Powell and Christian Arendt owned and operated of Momentum Sales & Marketing. Powell and Arendt implemented an "invoice" payment method in an attempt to conceal the per swab payments. They then directed MBM to create "invoices" that appeared to be based on hours worked but were, in fact, based on the number of swabs submitted for genetic testing. MBM then passed the new "invoice" compensation structure on to Senior Care to implement.

50. As a consequence, Chin and Sword then switched to this new "invoice" compensation structure. On or about May 21, 2019, Chin emailed Sword and stated: "we need to send Matthew an invoice for this month's income[.] I am attaching a sample one w[h]ere we

13

just need to put the Senior Care logo etc on it and the billable hours to match our gross check at 100.00 per hour."

51. On or about May 31, 2019, Chin participated in a training conference call with William Rowland, on behalf of MBM, and sales representatives who marketed genetic tests. Chin congratulated his team for their efforts in collecting swabs, having gone from a total of 48 swabs to a total of 230 swabs in just one month. Chin advised the sales representatives to chase the "low hanging fruit." He explained that they would have more success in marketing the tests to Medicare beneficiaries who were elderly and less affluent. Chin advised the representatives to "go out and call on low income apartment complexes and food pantries and other low hanging fruit things on your spare time."

52. On or about June 17, 2019, Chin participated in another conference call with William Rowland and sales representatives. Chin told them that the "secret formula" for success in any sales and recruiting business was to first identify the "perfect client." Chin stated that the next step was to identify those who were influencers over the "perfect client." He gave the example of the activity director at a senior adult living center, someone who had authority to decide who was permitted in the building to speak to residents. Chin stated that an "irresistible offer" should be created to get the influencer to exert influence over the "perfect clients." He advised the representatives to discover what the influencers needed or wanted to entice them to support a marketing event where the representatives would be given access to seniors.

53. On July 9, 2019, Chin participated in another conference call with sales representatives. Chin told them that doctors had a conflict in marketing genetic testing if reimbursed by Medicare but how they "do that game" was that the doctor would solicit and then "we would send in a swabber to do it for 50-bucks, whatever." Chin told them that if a provider

14

wanted to participate in genetic testing but was concerned about their Medicare enrollment, the provider could send a letter to their senior patients marketing genetic testing in the provider's office or at the patient's home. Then Chin or a member of his team would meet with the patient to collect the swab. In return, the provider would be paid a "marketing fee."

54. Chin and Sword had a bank account at US Bank ending in 8747. Between on or about April 15, 2019 and August 30, 2019, William Rowland, on behalf of MBM, paid Chin and Sword approximately $95,348.00 by making fourteen electronic deposits into that account. These payments were made in exchange for the referral of Medicare beneficiaries for genetic testing and, as such, were illegal kickbacks.

55. Timothy Chin dba Senior Care had a bank account ending in 1147 at US Bank. Paycor was the company that administered Senior Care's payments to sales representatives. Between June 19, 2019 and September 4, 2019, Chin and Sword caused Paycor to electronically withdraw a total of $34,458.00 from that account. Chin and Sword, through their company Senior Care, used those funds to compensate Senior Care Marketers for genetic testing referrals and, as such, those payments were illegal kickbacks.

All in violation of 18 U.S.C. § 371.

**COUNTS TWO THROUGH TWENTY-THREE**
**Wire Fraud**
**18 U.S.C. §§ 1343 and 2**

56. All previous paragraphs of this information are realleged and incorporated by reference as though fully set forth herein.

57. On or about the dates listed below for the specific count, in the Western District of Missouri and elsewhere, defendants Timothy Chin and Lauren Sword, aiding and abetting each other and others, with intent to defraud and for the purpose of executing and

attempting to execute the scheme and artifice to defraud, used or caused the use of the United States Postal Service or any private or commercial interstate carrier or, knowingly caused to be transmitted by means of wire communications in interstate commerce, writings, signs, and signals for the purposes of executing the above-described scheme:

| Count | Date | Amount | Wire Transmission |
|---|---|---|---|
| 2 | 4/15/2019 | $885.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 3 | 5/01/2019 | $4,660.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 4 | 5/02/2019 | $395.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 5 | 5/15/2019 | $4,200.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 6 | 5/17/2019 | $1,708.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 7 | 5/30/2019 | $2,735.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 8 | 5/31/2019 | $5,055.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 9 | 6/14/2019 | $8,105.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 10 | 6/26/2019 | $7,750.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 11 | 7/05/2019 | $15,640.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 12 | 7/15/2019 | $13,035.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 13 | 7/29/2019 | $9,750.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 14 | 8/16/2019 | $5,340.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 15 | 8/30/2019 | $16,090.00 | Into Chin and Sword's US Bank account ending in 8747 |
| 16 | 6/19/2019 | $1,290.00 | From Paycor |
| 17 | 7/03/2019 | $1,240.00 | From Paycor |
| 18 | 7/05/2019 | $1,570.00 | From Paycor |
| 19 | 7/05/2019 | $2,460.00 | From Paycor |

| 20 | 7/05/2019 | $3,010.00 | From Paycor |
| 21 | 7/18/2019 | $1,225.00 | From Paycor |
| 22 | 9/04/2019 | $1,985.00 | From Paycor |
| 23 | 9/04/2019 | $1,225.00 | From Paycor |

**FORFEITURE ALLEGATION I**
**(Conspiracy)**

68.     The allegations contained in Counts 1 through 23 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

69.     As a result of the defendants' conduct as alleged in Counts 1 through 23, in violation of 18 U.S.C. §371 and 42 U.S.C. § 1320a-7(b)(2), the defendants shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, which represents or is traceable to the gross proceeds the defendants obtained, directly or indirectly, as a result of such violations, including, but not limited to:

70.     A money judgment representing the gross proceeds the defendants obtained, directly and indirectly, as a result of the violations.

71.     If any of the property described above as being subject to forfeiture, as a result of any act of omission of the defendants:

  a.     cannot be located upon the exercise of due diligence;

  b.     has been transferred or sold to, or deposited with, a third person;

  c.     has been placed beyond the jurisdiction of the Court;

  d.     has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

## **FORFEITURE ALLEGATION II**
## **(Wire Fraud)**

72. The allegations contained in Counts 1 through 23 of this indictment are re-alleged and incorporated by reference for the purpose of alleging a forfeiture pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 1343 and 28 U.S.C. § 2461.

73. As a result of the offenses alleged in Counts 2 through 23 of this Indictment, and pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461, the defendant shall forfeit to the United States all property, real and personal, constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of the violation incorporated by reference in this Allegation, including, but not limited to:

### Money Judgment

74. A money judgment in the amount of $95,348.00 representing proceeds obtained by the defendant in that the sum in aggregate, constitutes or is derived from proceeds traceable to the offenses set forth in Counts 2 through 23.

### Substitute Assets

75. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred, sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of forfeitable property.

A TRUE BILL.

*/s/ Sharon Williams*
FOREPERSON OF THE GRAND JURY

*/s/ Lucinda S. Woolery*
Lucinda S. Woolery
Assistant United States Attorney

Dated: 11/29/2022
Kansas City, Missouri